1
2
3
4
5
6
7
8         **UNITED STATES DISTRICT COURT**
9         **CENTRAL DISTRICT OF CALIFORNIA**
10         **EASTERN DIVISION**
11

| | | |
|---|---|---|
| CHRISTINE L. W., | ) | No. ED CV 19-1377-PLA |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| v. | ) | |
| | ) | |
| ANDREW M. SAUL, COMMISSIONER | ) | |
| OF SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

**I.**

**PROCEEDINGS**

Christine L. W.[1] ("plaintiff") filed this action on July 26, 2019, seeking review of the Commissioner's denial of her application for a period of disability and Disability Insurance Benefits ("DIB"). The parties filed Consents to proceed before a Magistrate Judge on August 16, 2019, and September 4, 2019. Pursuant to the Court's Order, the parties filed a Joint Submission (alternatively "JS") on August 12, 2020, that addresses their positions concerning the disputed

---

[1] In the interest of protecting plaintiff's privacy, this Memorandum Opinion and Order uses plaintiff's (1) first name and middle and last initials, and (2) year of birth in lieu of a complete birth date. See Fed. R. Civ. P. 5.2(c)(2)(B), Local Rule 5.2-1.

1  issues in the case.  The Court has taken the Joint Submission under submission without oral

2  argument.

3

4  **II.**

5  **BACKGROUND**

6      Plaintiff was born in 1952.  [Administrative Record ("AR") at 158.]  She has past relevant

7  work experience as a medical assistant.  [Id. at 21, 59.]

8      On February 19, 2016, plaintiff protectively filed an application for a period of disability and

9  DIB alleging that she has been unable to work since November 19, 2011.  [Id. at 14; see also id.

10  at 158-64.]  After her application was denied initially and upon reconsideration, plaintiff timely filed

11  a request for a hearing before an Administrative Law Judge ("ALJ").  [Id. at 101-02.]  A hearing

12  was held on May 1, 2018, at which time plaintiff appeared represented by an attorney, and testified

13  on her own behalf.  [Id. at 26-65.]  A vocational expert ("VE") also testified.  [Id. at 58-64.]  On

14  August 16, 2018, the ALJ issued a decision concluding that plaintiff was not under a disability from

15  November 19, 2011, the alleged onset date, through December 31, 2014, the date last insured.

16  [Id. at 14-21.]  Plaintiff requested review of the ALJ's decision by the Appeals Council.  [Id. at 155-

17  57.]  When the Appeals Council denied plaintiff's request for review on June 1, 2019 [id. at 1-5],

18  the ALJ's decision became the final decision of the Commissioner.  See Sam v. Astrue, 550 F.3d

19  808, 810 (9th Cir. 2008) (per curiam) (citations omitted).  This action followed.

20

21  **III.**

22  **STANDARD OF REVIEW**

23      Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's

24  decision to deny benefits.  The decision will be disturbed only if it is not supported by substantial

25  evidence or if it is based upon the application of improper legal standards.  Berry v. Astrue, 622

26  F.3d 1228, 1231 (9th Cir. 2010) (citation omitted).

27      "Substantial evidence . . . is 'more than a mere scintilla[,]' . . . [which] means -- and means

28  only -- 'such relevant evidence as a reasonable mind might accept as adequate to support a

2

conclusion.'"  Biestek v. Berryhill, 139 S. Ct. 1148, 1154, 203 L. Ed. 2d 504 (2019) (citations omitted); Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017).  "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld."  Revels, 874 F.3d at 654 (internal quotation marks and citation omitted).  However, the Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence."  Id. (quoting Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014) (internal quotation marks omitted)).  The Court will "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely."  Id. (internal quotation marks and citation omitted); see also SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S. Ct. 454, 87 L. Ed.  626 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").

## IV.

### THE EVALUATION OF DISABILITY

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months.  Garcia v. Comm'r of Soc. Sec., 768 F.3d 925, 930 (9th Cir. 2014) (quoting 42 U.S.C. § 423(d)(1)(A)).

## A.    THE FIVE-STEP EVALUATION PROCESS

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920; Lounsbury v. Barnhart, 468 F.3d 1111, 1114 (9th Cir. 2006) (citing Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999)).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied.  Lounsbury, 468 F.3d at 1114.  If the claimant is not currently engaged in substantial gainful activity, the

second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied. Id. If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. § 404, subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded. Id. If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform her past work; if so, the claimant is not disabled and the claim is denied. Id. The claimant has the burden of proving that she is unable to perform past relevant work. Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992). If the claimant meets this burden, a prima facie case of disability is established. Id. The Commissioner then bears the burden of establishing that the claimant is not disabled because there is other work existing in "significant numbers" in the national or regional economy the claimant can do, either (1) by the testimony of a VE, or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R. part 404, subpart P, appendix 2. Lounsbury, 468 F.3d at 1114. The determination of this issue comprises the fifth and final step in the sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 721, 828 n.5 (9th Cir. 1995); Drouin, 966 F.2d at 1257.

**B.     THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity during the period from November 19, 2011, the alleged onset date, through December 31, 2014, the date last insured. [AR at 16.] At step two, the ALJ concluded that, through the date last insured, plaintiff had the severe impairments of psoriatic arthritis; bilateral knee degenerative joint disease, status post surgery; left shoulder rotator cuff tear, status post rotator cuff repair; and interstitial cystitis. [Id.] At step three, the ALJ determined that, through the date last insured, plaintiff did not have an impairment or a combination of impairments that meets or medically

1  equals any of the impairments in the Listing.  [Id. at 17.]  The ALJ further found that, through the

2  date last insured, plaintiff retained the residual functional capacity ("RFC")[2] to perform light work

3  as defined in 20 C.F.R. § 404.1567(b),[3] as follows:

> [She] was unable to crawl.  She was able to occasionally climb ladders, ropes and
> scaffolds and kneel.  She was able to frequently climb ramps and stairs, balance,
> stoop, and crouch.  She was able to frequently reach overhead with bilateral upper
> extremities.  She needed to avoid extreme cold, vibration and hazards, including
> unprotected heights and dangerous machinery.  She needed to work in close
> proximity to a restroom.

8  [Id.]  At step four, based on plaintiff's RFC and the testimony of the VE, the ALJ concluded that

9  through the date last insured, plaintiff was able to perform her past relevant work as a medical

10  assistant.  [Id. at 21.]  Accordingly, the ALJ determined that plaintiff was not disabled at any time

11  from the alleged onset date of November 19, 2011, through December 31, 2014, the date last

12  insured.  [Id.]

## V.

## THE ALJ'S DECISION

16  Plaintiff contends that the ALJ erred when he:  (1) gave little weight to the opinions of

17  plaintiff's treating physician, Raymond Press, M.D.; and (2) rejected plaintiff's subjective symptom

18  testimony.  [JS at 4.]  As set forth below, the Court agrees with plaintiff, in part, and remands for

19  further proceedings.

---

[2]  RFC is what a claimant can still do despite existing exertional and nonexertional
limitations.  See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).  "Between steps
three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which
the ALJ assesses the claimant's residual functional capacity."  Massachi v. Astrue, 486 F.3d 1149,
1151 n.2 (9th Cir. 2007) (citation omitted).

[3]  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying
of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in
this category when it requires a good deal of walking or standing, or when it involves sitting most
of the time with some pushing and pulling of arm or leg controls. To be considered capable of
performing a full or wide range of light work, you must have the ability to do substantially all of
these activities. If someone can do light work, we determine that he or she can also do sedentary
work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for
long periods of time."  20 C.F.R. § 404.1567(b).

1    **A.    MEDICAL OPINIONS**

2         **1.    Legal Standard**

3         "There are three types of medical opinions in social security cases:  those from treating

4    physicians, examining physicians, and non-examining physicians." <u>Valentine v. Comm'r Soc. Sec.</u>

5    <u>Admin.</u>, 574 F.3d 685, 692 (9th Cir. 2009); <u>see also</u> 20 C.F.R. §§ 404.1502, 404.1527.[4]  The Ninth

6    Circuit has recently reaffirmed that "[t]he medical opinion of a claimant's treating physician is given

7    'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory

8    diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's]

9    case record.'" <u>Trevizo v. Berryhill</u>, 871 F.3d 664, 675 (9th Cir. 2017) (quoting 20 C.F.R. §

10   404.1527(c)(2)) (second alteration in original).  Thus, "[a]s a general rule, more weight should be

11   given to the opinion of a treating source than to the opinion of doctors who do not treat the

12   claimant." <u>Lester</u>, 81 F.3d at 830; <u>Garrison</u>, 759 F.3d at 1012 (citing <u>Bray v. Comm'r Soc. Sec.</u>

13   <u>Admin.</u>, 554 F.3d 1219, 1221, 1227 (9th Cir. 2009)); <u>Turner v. Comm'r of Soc. Sec.</u>, 613 F.3d

14   1217, 1222 (9th Cir. 2010).  "The opinion of an examining physician is, in turn, entitled to greater

15   weight than the opinion of a nonexamining physician." <u>Lester</u>, 81 F.3d at 830; <u>Ryan v. Comm'r</u>

16   <u>of Soc. Sec.</u>, 528 F.3d 1194, 1198 (9th Cir. 2008).

17        "[T]he ALJ may only reject a treating or examining physician's uncontradicted medical

18   opinion based on clear and convincing reasons." <u>Trevizo</u>, 871 F.3d at 675 (citing <u>Ryan</u>, 528 F.3d

19   at 1198).  "Where such an opinion is contradicted, however, it may be rejected for specific and

20   legitimate reasons that are supported by substantial evidence in the record." <u>Id.</u> (citing <u>Ryan</u>, 528

21   F.3d at 1198).  When a treating physician's opinion is not controlling, the ALJ should weigh it

22   _____

23        [4]    The Court notes that for all claims filed on or after March 27, 2017, the Rules in 20 C.F.R.
     § 404.1520c (not § 404.1527) shall apply.  The new regulations provide that the Social Security
24   Administration "will not defer or give any specific evidentiary weight, including controlling weight,
     to any medical opinion(s) or prior administrative medical finding(s), including those from your
25   medical sources." 20 C.F.R. § 404.1520c.  Thus, the new regulations eliminate the term "treating
     source," as well as what is customarily known as the treating source or treating physician rule.
26   <u>See</u> 20 C.F.R. § 404.1520c; <u>see also</u> 81 Fed. Reg. 62560, at 62573-74 (Sept. 9, 2016). However,
     the claim in the present case was filed before March 27, 2017, and the Court therefore analyzed
27   plaintiff's claim pursuant to the treating source rule set out herein. <u>See also</u> 20 C.F.R. § 404.1527
     (the evaluation of opinion evidence for claims filed prior to March 27, 2017).
28

1   according to factors such as the nature, extent, and length of the physician-patient working

2   relationship, the frequency of examinations, whether the physician's opinion is supported by and

3   consistent with the record, and the specialization of the physician. Trevizo, 871 F.3d at 676; see

4   20 C.F.R. § 404.1527(c)(2)-(6).  The ALJ can meet the requisite specific and legitimate standard

5   "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence,

6   stating his interpretation thereof, and making findings." Reddick v. Chater, 157 F.3d 715, 725 (9th

7   Cir. 1998).  The ALJ "must set forth his own interpretations and explain why they, rather than the

8   [treating or examining] doctors', are correct."  Id.

9        Although the opinion of a non-examining physician "cannot by itself constitute substantial

10  evidence that justifies the rejection of the opinion of either an examining physician or a treating

11  physician," Lester, 81 F.3d at 831, state agency physicians are "highly qualified physicians,

12  psychologists, and other medical specialists who are also experts in Social Security disability

13  evaluation." 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i); Soc. Sec. Ruling 96-6p; Bray, 554

14  F.3d at 1221, 1227 (the ALJ properly relied "in large part on the DDS physician's assessment" in

15  determining the claimant's RFC and in rejecting the treating doctor's testimony regarding the

16  claimant's functional limitations).  Reports of non-examining medical experts "may serve as

17  substantial evidence when they are supported by other evidence in the record and are consistent

18  with it." Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).

19

20        **2.    Dr. Press**

21        On November 7, 2016, almost two years after plaintiff's date last insured, Dr. Press, who

22  treated plaintiff from July 2014 to "at least April 2018," completed a physical residual functional

23  capacity questionnaire ("Questionnaire"), in which he opined that plaintiff had the RFC to perform

24  light work, with some postural limitations and a need to work in close proximity to a restroom. [JS

25  at 4; AR at 389-92.]  In the Questionnaire, Dr. Press noted that he examined plaintiff every two

26  months for her psoriatic arthritis, and that her prognosis was fair. [AR at 389.]  He stated she had

27  symptoms of fatigue, lower back pain, and bilateral knee pain, with mild to moderate lower back

28  pain resulting from her knee pain. [Id.]  He referenced x-rays that reflected degenerative changes

1    in plaintiff's knees and in her lower back, and stated that she was being treated with medications.

2    (Id. (noting x-ray showed changes in plaintiff's "knees & L/S" and that she was being treated with

3    Simponi Aria (an intravenous infusion for psoriatic arthritis administered every two months (see

4    http://rxlist.com) and methotrexate)).   He also stated that plaintiff's depression and anxiety affect

5    her physical condition.  [Id.]  Dr. Press opined that plaintiff could only perform low stress jobs, with

6    an option to take naps [id. at 390]; her symptoms would frequently interfere with her attention and

7    concentration [id.]; she was limited to less than two hours of sitting or standing/walking in an eight-

8    hour workday [id.]; after sitting for thirty minutes she would need to get up and could not stand

9    more than twenty minutes before needing to sit down [id.]; and she needed to shift positions at will,

10   take hourly unscheduled breaks, and elevate her legs to 30 degrees when sitting for prolonged

11   periods.  [Id. at 390-91.]  Dr. Press also determined that plaintiff could rarely lift 10 or 20 pounds;

12   never lift 50 pounds; could rarely look down, turn her head right or left, look up, hold her head in

13   a static position, or twist; never stoop, crouch, climb ladders or stairs; could only use her bilateral

14   hands, fingers, and arms for 50% of an eight-hour workday; and would miss more than four days

15   of work per month as a result of her impairments or treatment.  [Id. at 391.]  He stated that plaintiff

16   had these limitations since at least July 2014.  [Id. at 392.]

17        The ALJ summarized Dr. Press' treatment notes prior to plaintiff's date last insured of

18   December 31, 2014, and gave his opinion "little weight":

19

20        As for [plaintiff's] psoriatic arthritis, through the date last insured, the record did not
          support a finding that it was so severe to be disabling.  Despite her allegation of
21        severe fatigue and pain due to sporadic arthritis, the record appeared to indicate no
          treatment for her psoriatic arthritis until July 2014, nearly three years after the
22        alleged onset date.  She presented to Dr. Raymond I. Press in July 2014 with
          sudden complaints of bilateral knee pain.  She continued to complain of bilateral
23        knee pain in August 2014.  She was started on methotraxate [sic].  She complained
          of bilateral knee pain, and right elbow and hand pain in October 2014, but also
24        reported that the pain was worse with the weather change.  She reported that
          methotrexate was not helping.  She also reported [i]n December 2014 that she felt
25        the medications were not helpful, however, treatment notes reveal that she reported
          doing well.  Although [plaintiff] reported that methotrexate was not helpful, the record
26        also revealed that, [she] had been receiving treatment for her psoriatic arthritis for
          only four months.  As such, through the date last insured, the record did not
27        establish that [her] psoriatic arthritis remained unabated despite prolonged
          treatment.

28        . . . .

8

1    Dr. Press' opinion is inconsistent with the record through the date last insured.  As
2    discussed above in detail, through the date last insured, the treatment notes, including Dr. Press' own treatment notes, failed to reveal any objective findings which would support the degree of limitations found by Dr. Press.

3

4  [Id. at 19, 20 (citing id. at 355-60).]

5        Plaintiff argues that Dr. Press' opinion *is* consistent with his treatment notes dating from

6  2015 through 2018, which reflect that in 2015 he administered injections in her bilateral knees; that

7  after two sets of cortisone injections, plaintiff's pain "was still so significant that she was unable

8  to sleep through the night or straighten her left knee due to an increase in arthritis pain and

9  inflammation"; and that even in April 2018, a note reflected that plaintiff's pain was an 8 out of 10.

10  [JS at 6-7 (citing AR at 415, 417, 418, 421, 423, 426, 427, 429, 430).]  She argues that "[t]his is

11  significant because [plaintiffs'] pain had not decreased amidst aggressive treatment lasting over

12  three years." [Id. at 7.] Plaintiff submits, therefore, that Dr. Press' Questionnaire findings took into

13  account his long-term treating relationship with plaintiff and was consistent with plaintiff's history

14  of "bilateral knee pain and treatment."  [Id.]

15        Plaintiff further argues that Dr. Press' opinion is consistent with the treatment notes from

16  plaintiff's other treating providers.  [Id.]  For instance, David Chao, M.D., was plaintiff's orthopedic

17  surgeon from December 2011-2015:  on April 4, 2012, and November 28, 2012, respectively, he

18  performed a left and right knee arthroscopy, meniscectomy, and chondroplasty of the patella and

19  medial femoral condyle; post-surgery, Dr. Chao noted that plaintiff's bone-on-bone pathology may

20  not improve even after surgical intervention; in December 2012, he performed a left shoulder

21  arthroscopy, debridement, decompression, and rotator cuff repair; and in May 2013, he noted that

22  plaintiff continued to experience bilateral knee pain and stated that "[u]ltimately, she is going to

23  need partial total replacement" and discussed palliative care with her. [Id. (citing AR at 283-314).]

24  Plaintiff submits, therefore, that Dr. Press' opinions "are supported by surgical evidence and

25  medical opinions from Dr. Chao that date further back than Dr. Press' own treating relationship"

26  with plaintiff.  [Id.]  She states that Dr. Press' opinions "build on and continue the treating

27  relationship with Dr. Chao," and plaintiff's "[c]ontinuous treatment and symptoms lasting from

28  2013/2014 through 2016 articulate a consistent thread that demonstrates that Dr. Press' opinions

were consistent with his own treatment notes and the notes of other treating physicians." [Id. at 7-8.] Plaintiff concludes that the ALJ erred when he stated that Dr. Press' opinions were not supported by his own treatment notes, or by the records of plaintiff's other physicians, and asserts instead that "both Dr. Press' own treatment notes and Dr. Chao's treatment history reflect a need for significant restrictions to be placed upon [plaintiff's] residual functional capacity limitations." [Id. at 8.] She states that although the ALJ may have articulated "specific" reasons for rejecting Dr. Press' opinions, they were not legitimate reasons, "failed to provide a genuine justification for the rejection of Dr. Press' treating opinions," and were not supported by substantial evidence. [Id. at 8-9.]

Defendant responds that Dr. Press' November 2016 opinion "is almost two years after Plaintiff's date last insured," and the evidence "at best relates . . . to potential subsequent worsening of Plaintiff's condition, not to the relevant time period" at issue. [Id. at 9 (citations omitted).] Defendant argues that the ALJ "correctly noted that Dr. Press' own treatment notes do not reflect objective findings consistent with his opinion that Plaintiff is almost completely incapacitated." [Id. (citing AR at 20, 389-92).] He states that the treatment notes prior to the date last insured "reflect plaintiff's complaints of pain in her bilateral knees but fail to include any significant clinical findings," and Dr. Press "did not at any time note that Plaintiff had difficulties with muscle strength, range of motion, or ambulation," or with depression or anxiety. [Id. (citing AR at 355-59).] Defendant also argues that Dr. Chao "did not provide any opinion in the record regarding Plaintiff's physical limitations," and that the ALJ noted that five days after plaintiff's left knee surgery in April 2012, Dr. Chao stated plaintiff was "doing well," was "ambulating with virtually normal gait, with minimal swelling and trace effusion," and "continued to do well a month after her surgery, when she was walking fine in spite of her admission that she was not doing much rehabilitation." [Id. at 10 (citing AR at 18-19, 291-92, 304-06).] Similarly, a few days after plaintiff's right knee surgery in November 2012, plaintiff "stated that she was happy with her right knee." [Id. at 10-11 (citing AR at 18, 288).] Defendant finds it significant that despite Dr. Chao's May 2013 opinion that plaintiff would ultimately need partial total knee replacement, "he also found that there were 'no real changes' and 'no effusion' upon examination." [Id. at 11 (citing AR at

283).] Defendant finds it even more important that "Dr. Chao did not note any functional limitations with respect to [plaintiff's] knee, and did not indicate that she need [sic] knee replacement at that time." [Id. (citing AR at 283).]  Defendant further argues that the ALJ's rejection of Dr. Press' "extreme opinion" is further supported by the findings of the State agency reviewing physicians, who opined in April and July 2016, respectively, that plaintiff could perform a range of medium work.  [Id. (citing AR at 20, 72-74, 84-86).]  Although the ALJ gave these opinions "some weight," he further limited plaintiff to light work based on her testimony and treatment records.  [Id. (citation omitted).]  Nevertheless, defendant notes that the ALJ properly gave greater weight to these opinions than to the opinions of treating physician Dr. Press because the "Ninth Circuit has repeatedly held that reviewing physicians are highly qualified experts whose opinions may provide a substantial basis for an ALJ's conclusions." [Id. (citations omitted).]  Defendant concludes that the ALJ's RFC determination was supported by substantial evidence and free from legal error and his "interpretation of the evidence was reasonable." [Id. at 12 (citation omitted).]

Plaintiff replies that notwithstanding that some of the evidence presented by Dr. Press falls beyond plaintiff's date last insured, "the material evidence presented from Dr. Press and Dr. Chao from before the date last insured is still significant enough to warrant a finding that the ALJ failed to properly consider the opinions of [plaintiff's] treating physicians." [Id.]  She argues that although Dr. Chao did not provide any limitations with regard to plaintiff's impairments, by February 2013 -- after her surgeries -- plaintiff "had already received five Supartz injections in her right knee," and Dr. Chao opined that plaintiff "was unsure as to how well the injections helped her and that [her] pain was chronic along the medial compartment to the right knee and left knee." [Id. at 13 (citing AR at 283-84).]  He also noted that six months after plaintiff's knee surgery, there were "no real changes," which plaintiff interprets to mean that plaintiff "was still in significant pain after the surgery." [Id. (citing AR at 283).]  Plaintiff states that "[a] knee that had been surgically repaired to the point that it no longer provides physical limitations is not a knee that needs five Supartz injections post-surgery," and argues that the ALJ's argument that Dr. Chao's treatment notes did not discuss any physical limitations "is unfounded and does not make sense," as an individual who is in "such significant pain that two knee surgeries and multiple [post-surgery] injections are not

able to remedy that pain will undoubtedly have physical limitations." [Id. (citations omitted).] Plaintiff also argues that Dr. Chao's statement that plaintiff will need a partial total knee replacement and palliative care "sufficiently demonstrates" plaintiff's physical limitations prior to her date last insured and also provides support for Dr. Press' opinions. [Id. at 13-14 (citing AR at 283).]

### 3.   Analysis

In December 2011, more than three years prior to plaintiff's date last insured, the record reflects that she sought treatment from Dr. Chao complaining of pain in both knees.  Dr. Chao performed surgery on the left knee in February 2012, and on the right knee in November 2012. On February 21, 2012, Dr. Chao noted that his treatment plan was to proceed with the left knee surgery to address plaintiff's meniscal tear; he also informed plaintiff that "once the inflammation has calmed down," plaintiff would need to consider "Supartz steroid injections for the leg to address the arthritis." [AR at 295.]  He also informed plaintiff that the surgery and subsequent injections "will not give her a normal knee, but the goal [is] to give her an improved knee, and that she "would likely need Supartz or Synvisc in her right knee in addition." [Id.]  In his April 4, 2012, surgical note, Dr. Chao stated that he had explained to plaintiff that "any pain from her meniscus tear would be remedied with [the] meniscectomy, however pain that was generated from her arthritic change may only be temporarily alleviated." [Id. at 305.]  Similarly, with respect to the November 28, 2012, surgery on her right knee -- also to repair a meniscal tear -- Dr. Chao noted, among other things, that upon "entering into the medial compartment . . . there was grade 4 arthritis of the medial femoral condyle . . . with grade 4 arthritis [of approximately 50%] of the medial tibial plateau," and grade 2 arthritis of the patella and femoral trochlea. [Id. at 302-03.]  Dr. Chao also noted, post-surgery, that plaintiff had bone-on-bone pathology that may not improve even after surgical intervention. [Id. at 288.]  Accordingly, the ALJ's determination that Dr. Press' opinions were not supported by the treatment notes from other treating physicians was not a specific and legitimate reason supported by substantial evidence for discounting those opinions.

With respect to the ALJ's determination that Dr. Press' opinions were not consistent with

his own treatment records, those records reflect that in July 2014, plaintiff complained of chronic bilateral knee pain and Dr. Press noted bilateral knee effusions [id. at 359]; in August 2014, based on plaintiff's complaint of chronic bilateral knee pain, x-rays ordered by Dr. Press reflected mild-moderate osteoarthritic changes [id. at 315, 358]; in October 2014, he reported plaintiff was experiencing bilateral knee pain, right elbow pain, right hand pain -- "hand worse with the weather change,"[5] and that plaintiff's methotrexate was not working [id. at 357]; and in December 2014, Dr. Press again noted effusion in plaintiff's knees [id. at 355].  In 2015 Dr. Press administered injections in plaintiff's bilateral knees; even after two sets of cortisone injections, plaintiff's pain "was still so significant that she was unable to sleep through the night or straighten her left knee due to an increase in arthritis pain and inflammation"; and even in April 2018, a note reflected that plaintiff's pain was an 8 out of 10.  [JS at 6-7 (citing AR at 415, 417, 418, 421, 423, 426, 427, 429, 430.]  In short, Dr. Press' treatment of plaintiff, both prior to and after plaintiff's date last insured, reflects that -- despite plaintiff's surgeries and aggressive treatment from Dr. Chao even post-surgery -- Dr. Press also treated plaintiff's knee pain aggressively for several years and that his notes and treatment were consistent with the treatment plaintiff previously received from Dr. Chao, and with the opinions Dr. Press expressed in the Questionnaire.  Accordingly, this was not a specific and legitimate reason supported by substantial evidence for discounting Dr. Press' opinions, which were supported by his own treatment records.

In discounting the intensity, persistence, and limiting effects of plaintiff's symptoms and, therefore, by implication, Dr. Press' opinions, the ALJ reasoned that plaintiff's surgery was evidence that her "symptoms were genuine," but that the "record reflects that the surgery was generally successful in relieving the symptoms."  [AR at 18.]  In support, he cited two treatment notes shortly after the April 2012 surgery (five days after, and one month after) that reflected plaintiff "was overall doing well," "happy with her results so far," and "feeling very good."  [Id. (citing

---

[5]   The ALJ stated that plaintiff "complained of bilateral knee pain, and right elbow and hand pain in October 2014, but also reported that the pain was worse with the weather change," implying that Dr. Press stated *all* of plaintiff's pain was worse with the weather change.  [AR at 19.] This mischaracterizes Dr. Press' treatment note, which clearly reflects that plaintiff complained that her *hand* pain was worse with the weather change.  [Id. at 357.]

1    id. at 291, 292).]  Similarly, "a few days" after the November 2012 surgery, the ALJ noted that

2    plaintiff reported that she "was happy with the right knee." [Id. (citing id. at 289).]  By May 2013,

3    however, the ALJ observed that Dr. Chao's May 2013 notes reflect that plaintiff "continued to

4    complain of bilateral knee pain," that she questioned the effectiveness of the injections, and that

5    examination showed "crepitance medially and medial pseudolaxity in the bilateral knees."  [Id.]

6    The ALJ then stated, "[h]owever, there was no effusion," and no other "abnormal objective findings

7    due to her bilateral knee pain, such as gait abnormality," without providing an explanation as to

8    the relevance of these observations to plaintiff's ongoing bilateral knee pain and Dr. Chao's clinical

9    observations of crepitance and pseudolaxity. [Id. at 18-19 (citing id. at 283-87).]  Indeed, Dr. Chao

10   did not express surprise or consternation that he observed no effusion and a normal gait; in fact,

11   he also noted that there had been "[n]o real changes" as a result of the surgery, that plaintiff would

12   ultimately need a partial total replacement and palliative care, and proceeded with additional

13   Supartz injections for a number of visits.  [Id. at 283.]  Moreover, to the extent that the ALJ also

14   implied that plaintiff's knee pain was in remission for a period of time and that she presented to

15   Dr. Press in July 2014 "with sudden complaints of bilateral knee pain," it is clear from Dr. Chao's

16   records that these complaints were likely ongoing and not all that "sudden."[6]

17       The Court also notes that the ALJ commented on the fact that plaintiff stopped working in

18   August 2010 "for reasons not related to the allegedly disability impairments," and "reported in her

19   disability report that she stopped working in August 2010 due to her client passing away."  [Id. at

20   _____

21       [6]    In discounting plaintiff's subjective symptom testimony, the ALJ commented on the fact that
22   there appears to be a gap in the treatment record between May 2013 (Dr. Chao's final treatment
     note in the record) and July 2014 (Dr. Press' first treatment note in the record).  [AR at 19.]  See
23   Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Dir. 2008) (in assessing the credibility of an
     individual's subjective symptom testimony, an ALJ may consider any inadequately explained or
24   unexplained failure to pursue or follow treatment) (citation omitted).  In this case, however, the ALJ
     did not seek an explanation from plaintiff as to the reason for this apparent break in service and
25   the parties point to nothing in the record to explain this gap.  In any event, this "reason" was used
26   to discount plaintiff's testimony, and, if at all, only impliedly to discount Dr. Press' opinions.
     Indeed, although there is no treatment evidence during this time period, there is also no evidence
27   reflecting that plaintiff's symptoms had disappeared.  Accordingly, in light of the record herein, the
     Court does not consider this to be a specific and legitimate reason supported by substantial
28   evidence to discount Dr. Press' opinions.

20 (citation omitted).]  To the extent the ALJ intended this observation to be a reason to discount Dr. Press' opinions, the ALJ did not explain how this "evidence" in any way bears on the opinions of Dr. Press, on Dr. Chao's findings, and/or even on plaintiff's subjective symptom testimony. Indeed, the Court is hard-pressed to make any such connection given that plaintiff alleged an onset date that is more than a year *after* the death of her former client.  The Court finds, therefore, that this was not a specific and legitimate reason supported by substantial evidence to discount Dr. Press' opinions.

Finally, the ALJ gave "some" weight to the opinions of the State agency consultants in April 2016 and July 2016 (without the benefit of Dr. Press' November 2016 opinions), both of whom found plaintiff capable of medium-level exertional work, and that she could occasionally climb ladders, ropes, and scaffolds; frequently climb ramps and stairs; frequently balance, stoop, kneel, crouch, and crawl; and that she was capable of limited overhead reaching with the left upper extremity.  [Id. at 20 (citations omitted).]  The ALJ, however, found these RFC determinations to be "less restricting than the record supports," and limited plaintiff instead to a range of work at the light exertional level, finding she could never crawl; occasionally climb ladders, ropes, and scaffolds, and kneel; frequently climb ramps and stairs, balance, stoop, and crouch; frequently reach overhead bilaterally[7]; never be exposed to extreme cold, vibration, and hazards; and that she needed to work in close proximity to a restroom.  [Id.]  Thus, because the consulting reviewers' opinions were not supported by and consistent with other evidence in the record, they may not serve as substantial evidence.   Andrews, 53 F.3d at 1041.

Based on the foregoing, the ALJ's reasons for discounting Dr. Press' opinions were not specific and legitimate.  Remand is warranted on this issue.

---

[7]   Despite stating that the State agency consultant's findings were "less restricting than the record supports," the ALJ's finding that plaintiff was able to frequently reach overhead bilaterally as "surgery was generally successful in relieving [plaintiff's] symptoms," was actually a *reduction* in the upper left extremity limitation found by the State agency consultants, who, after reviewing the record, determined plaintiff was limited in her ability to reach overhead with her left upper extremity.  [AR at 19.]

**B.    SUBJECTIVE SYMPTOM TESTIMONY**

Plaintiff argues that none of the reasons provided by the ALJ for discounting her subjective symptom testimony is clear and convincing, and defendant counters those arguments.  Because the matter is being remanded for reconsideration of the medical opinions, and the ALJ on remand as a result must reconsider plaintiff's RFC in light of the record evidence, the ALJ must also reconsider on remand, pursuant to Social Security Ruling ("SSR")[8] 16-3p,[9] plaintiff's subjective symptom testimony and, based on his reconsideration of plaintiff's RFC, provide specific, clear and convincing reasons for discounting plaintiff's subjective symptom testimony if warranted.  See Trevizo, 871 F.3d at 678 n.5; Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1103 (9th Cir. 2014) (citation omitted) (the "ALJ must identify the testimony that was not credible, and specify 'what evidence undermines the claimant's complaints.'"); Brown-Hunter v. Colvin, 806 F.3d 487, 493-94 (9th Cir. 2015) (the ALJ must identify the testimony he found not credible and "link that testimony to the particular parts of the record" supporting his non-credibility determination).

## VI.

## REMAND FOR FURTHER PROCEEDINGS

The Court has discretion to remand or reverse and award benefits.  Trevizo, 871 F.3d at 682 (citation omitted).  Where no useful purpose would be served by further proceedings, or where the record has been fully developed, it is appropriate to exercise this discretion to direct an immediate award of benefits.  Id. (citing Garrison, 759 F.3d at 1019).  Where there are outstanding

---

[8]    "SSRs do not have the force of law.  However, because they represent the Commissioner's interpretation of the agency's regulations, we give them some deference.  We will not defer to SSRs if they are inconsistent with the statute or regulations."  Holohan v. Massanari, 246 F.3d 1195, 1202 n.1 (9th Cir. 2001) (citations omitted).

[9]    The Ninth Circuit in Trevizo noted that SSR 16-3p, which went into effect on March 28, 2016, "makes clear what our precedent already required:  that assessments of an individual's testimony by an ALJ are designed to 'evaluate the intensity and persistence of symptoms after [the ALJ] find[s] that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms,' and 'not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness.'"  Trevizo, 871 F.3d at 687 n.5 (citing SSR 16-3p).  Thus, SSR 16-3p shall apply on remand.

issues that must be resolved before a determination can be made, and it is not clear from the record that the ALJ would be required to find plaintiff disabled if all the evidence were properly evaluated, remand is appropriate. See Garrison, 759 F.3d at 1021.

In this case, there are outstanding issues that must be resolved before a final determination can be made. In an effort to expedite these proceedings and to avoid any confusion or misunderstanding as to what the Court intends, the Court will set forth the scope of the remand proceedings. First, because the ALJ failed to provide specific and legitimate reasons for discounting the opinions of Dr. Press, the ALJ on remand shall reassess the medical opinions of record, including the opinions of Dr. Press. The ALJ must explain the weight afforded to each opinion and provide legally adequate reasons for any portion of an opinion that the ALJ discounts or rejects. Second, the ALJ on remand, in accordance with SSR 16-3p, shall reassess plaintiff's subjective allegations and either credit her testimony as true, or provide specific, clear and convincing reasons, supported by substantial evidence in the case record, for discounting or rejecting any testimony. Finally, if warranted, the ALJ shall reassess plaintiff's RFC[10] and determine at step four, with the assistance of a VE if necessary, whether plaintiff is capable of performing her past relevant work as a medical assistant. If plaintiff is not so capable, or if the ALJ determines to make an alternative finding at step five, then the ALJ shall proceed to step five and determine, with the assistance of a VE if necessary, whether there are jobs existing in significant numbers in the regional and national economy that plaintiff can still perform.

/

/

/

/

/

---

[10]   Nothing in this Order is intended to disrupt the ALJ's finding that, at the least, through the date last insured, plaintiff has the severe impairments of psoriatic arthritis; bilateral knee degenerative joint disease, status post surgery; left shoulder rotator cuff tear, status post rotator cuff repair; and interstitial cystitis.

## VII.

### CONCLUSION

**IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED:  September __1__, 2020          _____
                                                                   PAUL L. ABRAMS
                                                          UNITED STATES MAGISTRATE JUDGE

18